# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
### SOUTHERN DIVISION

**GRACIE FAYE HARRIS FINLEY**                                                    **PLAINTIFF**


**v.**                                                                 **CAUSE NO. 1:25CV335-LG-BWR**


**AMERICREDIT FINANCIAL
SERVICES, INC., doing business
as GM Financial, and
GULFPORT CAPITAL, LLC,
doing business as Champion
Chrysler Dodge Jeep Ram**                                              **DEFENDANTS**


## ORDER GRANTING DEFENDANTS' MOTIONS TO COMPEL ARBITRATION AND DISMISS AND DENYING PLAINTIFF'S MOTIONS

Plaintiff signed a Purchase Agreement and Retail Installment Sale Contract ("RISC") containing arbitration clauses when she purchased a vehicle from Defendant Gulfport Capital, LLC ("the Dealership").[1]  Both agreements were assigned to Defendant AmeriCredit Financial Services, Inc., doing business as GM Financial ("GM Financial").  After the vehicle was repossessed, Plaintiff filed this pro se lawsuit claiming identity theft, fraud, misappropriation and conversion of funds, unjust enrichment, wrongful repossession, and negligent and willful violations of the FCRA and FDCPA.  Both Defendants have filed [9, 44] Motions to Compel Arbitration and to Dismiss.  Plaintiff filed [26, 47] Responses to both Motions and fifteen [11, 13, 15, 16, 17, 18, 19, 24, 25, 33, 34, 36, 40, 41, 49]

---

[1] Ellen Peer also signed the agreements required to purchase the vehicle, but she is not a party to this lawsuit.

Motions.[2]  After reviewing the submissions of the parties, the record in this matter, and the applicable law, the Court finds that Defendants' Motions to Compel Arbitration and Dismiss should be granted, and Plaintiffs' Motions should be denied.

## BACKGROUND

Plaintiff alleges that she "provided a trade-in vehicle valued at approximately $30,000, a $4,000 cash payment, and a $2,000 electronic-funds transfer (EFT) as down payment" when she purchased the vehicle.  Compl. [1-1] at 4.  Plaintiff still owed $37,000 on the trade-in vehicle, but she had a GAP insurance policy.  She claims Defendants "failed to apply Plaintiff's trade-in, down-payment, and GAP-insurance refund correctly and diverted those funds without consent."  *Id.*  She further states that "[t]he contract listed false income, incorrect residential and employment data, and inaccurate ownership information not supplied or approved by Plaintiff."  *Id.*[3]  According to Plaintiff, "[s]everal pages of the retail-installment contract contained forged, 'cut-and-paste,' or electronically inserted signatures purporting to be Plaintiff's.  She never executed, authorized, or consented to any e-

---

[2] Plaintiff has filed the following Motions: a [11] Motion to Strike Arbitration Defense, a [13] Motion for Hearing, a [15] Motion for Relief, a [16] Motion to Strike, a [17] Motion for Immediate Attention, a [18] Motion to Challenge and Void Contract, a second [19] Motion to Strike Motion to Compel Arbitration and Dismiss, a [24] Motion for Finding of Bad Faith and for Sanctions, a [25] Motion for Discovery, a [33] Motion to Proceed, a second [34] Motion for Hearing, a [36] Motion for Immediate Judicial Oversight and Protection due to Continued Injury and Refusal to Act, a [40] Motion Asserting Civil Conspiracy, a [41] Motion to Bar any "Newly Found" Documents, and a [49] Motion for Determination of Non-Formation of Contract and for Restorative Relief.

[3] Plaintiff appears to be referring to the credit application.

signature or digital-signature process. No verification record or IP authorization was ever produced." *Id.* at 5.

Plaintiff notified GM Financial "of suspected identity theft and fraud" related to the contract on July 16, 2025, and GM Financial responded that she "appeared to be a victim of identity theft and fraud." *Id.* She asserts, "Despite these acknowledgements, GM Financial "continued reporting the account as late and delinquent to Experian, Equifax, and TransUnion instead of freezing the file." *Id.* She claims GM Financial repossessed the vehicle on October 8, 2025, "[w]hile an active CFPB investigation was still open[,] and no written resolution had been provided." *Id.* Finally, she states, "No lawful accounting, final determination, or pre-repossession notice was ever issued. The loss of the vehicle and the resulting credit harm have caused ongoing emotional, medical, and financial hardship." *Id.* She requests reimbursement of her down payment, the value of the trade-in vehicle, GAP insurance proceeds, the payments made under the finance agreement, as well as compensation for a reduced credit score and lost credit opportunities, damages for emotional distress, reputational harm, and medical-related hardship, punitive damages, court costs, filing fees, and interest.

Defendants rely on two agreements containing arbitration clauses— a Purchase Agreement and a RISC. The Purchase Agreement is governed by Mississippi law, and the RISC is governed by federal law and Mississippi law. Both agreements are dated November 29, 2023. The original parties to these agreements were Plaintiff, Peer, and the Dealership. GM Financial's Assistant Vice President

for Consumer Services, Adrian Jones, has testified by Declaration that "[t]he

Dealership immediately assigned and transferred its entire interest in the [RISC]

and related documents, including the Purchase Agreement, to GM Financial."

Jones Dec. [10-1] at 4. [4]   The Dealership concedes that it assigned its entire interest

in the Purchase Agreement and RISC to GM Financial.  *See* Dealership's Mem. [45]

at 4.  The Purchase Agreement listed GM Financial as the lienholder, and the RISC

provided notice that the Dealership may assign the contract.

## DISCUSSION

"The [Federal Arbitration Act ("FAA")] establishes a 'federal policy favoring

arbitration requiring that [courts] rigorously enforce agreements to arbitrate.'"

*Shearson/Am. Exp., Inc. v. McMahon*, 482 U.S. 220, 226 (1987) (citation modified).

The Act provides that arbitration provisions included in agreements "evidencing a

transaction involving commerce . . . shall be valid, irrevocable, and enforceable, save

upon such grounds as exist at law or in equity for the revocation of any contract."  9

U.S.C. § 2.

> The FAA thereby places arbitration agreements on an equal footing
> with other contracts and requires courts to enforce them according to
> their terms.  Like other contracts, however, they may be invalidated by
> generally applicable contract defenses, such as fraud, duress, or
> unconscionability.

*Rent-A-Ctr., W., Inc. v. Jackson*, 561 U.S. 63, 67–68 (2010).

---

[4] The Fifth Circuit has found that testimony given in an uncontroverted declaration
is sufficient evidence to establish an assignment of contractual rights.  *Grant v.
Houser*, 469 F. App'x 310, 315 (5th Cir. 2012) (citing *Doddy v. Oxy USA, Inc.*, 101
F.3d 448 (5th Cir. 1996)).

## I. IDENTIFICATION OF SUBMISSIONS CONSIDERED WHEN DECIDING DEFENDANTS' MOTIONS TO COMPEL ARBITRATION

Given Plaintiff's pro se status, the Court has construed her submissions liberally. *See Coleman v. United States*, 912 F.3d 824, 828 (5th Cir. 2019) ("The filings of a pro se litigant are to be liberally construed and a pro se complaint, however inartfully pleaded, must be held to less stringent standards than formal pleadings drafted by lawyers.") (citation modified).  But "a pro se litigant is not exempt from compliance with relevant rules of procedural and substantive law." *See Birl v. Estelle*, 660 F.2d 592, 593 (5th Cir. 1981).  Pursuant to the Court's Local Rules, parties may file a response and memorandum in opposition to motions filed by the opposing party.  *See* L.U. Civ. R. 7.  The movant then has seven days to file a rebuttal to the response.  A response memorandum cannot exceed thirty-five pages. L.U. Civ. R. 7(b)(5).  Supplemental responses and sur-rebuttals are not provided for in the Court's Local Rules.

In the month following the filing of GM Financial's Motion, Plaintiff filed six [14, 21, 26-1, 30, 31, 32 ] affidavits, a [20] Summary of Claims and Evidence, three [35, 38, 42] Statements, a [37] Case Summary, two [12, 22] Memoranda, two [26, 47] Responses, two [39, 48] Surrebuttals, and sixteen [11, 13, 15, 16, 17, 18, 19, 23, 24, 25, 33, 34, 36, 40, 41, 49] Motions.[5]  Plaintiff has also filed a [47] Response and three [51, 52, 53] Surrebuttals to the Dealership's Motion.  Although Plaintiff's filings do not comply with the Court's Local Rules, Defendants did not file motions

---

[5] The Court previously denied Plaintiff's [23] Motion for Temporary Restraining Order.

to strike.  Therefore, the Court has reviewed and attempted to consider all of

Plaintiff's arguments and exhibits to the extent that they pertain to the arbitration

issue.

## II.  WHETHER THE ALLEGED ARBITRATION AGREEMENTS ARE ENFORCEABLE

When deciding a motion to compel arbitration, a court must first determine

"whether the parties entered into *any arbitration agreement at all*."  *Kubala v.*

*Supreme Prod. Servs., Inc.*, 830 F.3d 199, 201 (5th Cir. 2016) (emphasis in original).

"In conducting this inquiry, [courts] distinguish between validity or enforceability

challenges and formation or existence challenges."  *Arnold v. Homeaway, Inc.*, 890

F.3d 546, 550 (5th Cir. 2018) (citation modified).  Arguments concerning contract

formation should be decided by the court because those arguments pertain to

enforceability.  *Id.*; *Edwards v. Doordash, Inc.*, 888 F.3d 738, 744 (5th Cir. 2018).

Since arbitration clauses are severable from the remainder of the contract,

arguments pertaining to the validity of the entire contract are insufficient to avoid

arbitration.  *Green Tree Servicing, L.L.C. v. House*, 890 F.3d 493, 504 (5th Cir. 2018)

(citation modified).  Rather, parties opposing arbitration must challenge the

arbitration clause itself.  *Id.*

### A.  MISSISSIPPI LAW CONCERNING CONTRACT FORMATION

Plaintiff best explains her claims in a Surrebuttal.  She states, "I do not deny

that I made payments, insured the vehicle, or had possession of it for a period of

time.  I did those things because I was told the transaction was valid."  Pl.'s

Surrebuttal [51] at 1.  But she claims that the following "procedural steps required

to form a valid contract were never completed:"

- No government-issued photo identification for [Plaintiff] or the co-buyer was verified or recorded
- No driver's license number, issuing state, or expiration date appears in the documents
- No identity-verification record has been produced
- No underwriting approval confirming verification has been produced.

*Id.* at 2.  She also states that Defendants have not produced several records that

would prove her identity, validate her signature, and prove she agreed to

arbitration.  In addition, she claims that the credit application has two different

dates on it.[6]

State law governs the question of whether a contract was formed.  *Edwards*,

888 F.3d at 745.  A choice of law provision governs if that provision's validity has

not been specifically challenged.  *Id.*  Here, both the Purchase Agreement and the

RISC provide that Mississippi law applies, and the parties do not appear to dispute

that Mississippi law applies.  The elements of a contract under Mississippi law are:

"(1) two or more contracting parties, (2) consideration, (3) an agreement that is

sufficiently definite, (4) parties with legal capacity to make a contract, (5) mutual

assent, and (6) no legal prohibition precluding contract formation."  *LAGB, LLC v.*

*Total Merch. Servs., Inc.*, 284 So. 3d 720, 724 (Miss. 2019) (citation modified).

---

[6] The credit application has electronic signatures dated November 29, 2023. Plaintiff is referring to notations printed at the bottom of the application reflecting that the application was created on November 22, 2023, but printed on November 29, 2023.  It is unclear how these dates would affect the formation of the arbitration agreements.

Plaintiff has not provided any legal support for her claim that additional elements
are required to create a contract.

### B. PLAINTIFF'S "FAILURE TO VERIFY IDENTITY" AND "IDENTITY THEFT" ARGUMENTS

Plaintiff argues, "Because identity was never verified, the Defendants cannot
prove who signed the contract, who agreed to arbitration, who assumed the debt, or
even who they sold the vehicle to." Pl.'s Aff. [14] at 2 (emphasis omitted). She
explains that "[t]he contract packet contains no driver's license numbers, no state of
issuance, no photocopies of licenses, no identity verification forms, and no
compliance documentation." *Id.* "This single failure," she claims, "makes the entire
transaction void at inception. Everything that followed—including electronic
signatures, the RISC, the financing, the reporting, the collections, and the
repossession—was built on an illegal foundation." *Id.* She also alleges that GM
Financial has sent her seventeen letters that state:

> Please accept this letter as formal notification that GM Financial was
> recently contacted by you in reference to the above listed account.
> Based on information you provided, the account may have been
> fraudulently established as a result of identity theft.

> If you are the victim of identity theft regarding a GM Financial
> account and wish to request an investigation, the claim must be
> submitted in writing and mailed to GM Financial.

> For step-by-step instructions on how to request an investigation,
> please access gmfinancial.com. Click on the "Security" tab and then
> access "Fraud Investigation Process." If you are unable to access the
> instructions on the website, please contact us . . . .

> Once the required documents are received, GM Financial will
> investigate your claim.

*See, e.g.*, Ex. to Pl.'s Notice [46-1].

"'Identity theft' is a term referring to a variety of crimes, all of which involve 'stealing' someone's personal identifying information." Raymond T. Nimmer, Identity Theft, Law of Computer Technology § 17:76 (Dec. 2025) (citation modified). For example, in *Aiken v. World Finance Corp.*, a former loan customer sued a finance company after its employees stole his personal information and used it "to obtain sham loans and embezzle the proceeds for the employees' personal benefit." 644 S.E.2d 705, 707 (S.C. 2007). The *Aiken* court held that allegations of identity theft committed by the finance company's employees were outside the scope of the arbitration agreements contained in loan documents executed by the former loan customer. *Id.* at 709.[7]

Here, Plaintiff does not claim that her private information was stolen and used to open an account without her consent or knowledge. She has admitted that she was present at the dealership when the transaction took place and that she purchased the vehicle. Furthermore, the seventeen letters GM Financial sent her do not constitute admissions or findings that she has been the victim of identity theft. In these form responses, GM Financial merely stated that her "account *may have been* fraudulently established as a result of identity theft." *See, e.g.*, Ex. to Pl.'s Notice [46-1]. GM Financial gave Plaintiff instructions on how to open an

---

[7] Importantly, the *Aiken* decision pertained to the scope of the arbitration agreement, not contract formation. *Aiken v. World Fin. Corp.*, 644 S.E.2d 705, 709 (S.C. 2007). As explained infra, the scope of an arbitration agreement is decided by the arbitrator when an arbitration agreement contains a delegation clause.

identity-theft investigation, if necessary.  Plaintiff's assertions of "identity theft"

and "failure to verify identity" are essentially claims that certain information in her

credit application is either missing or incorrect.  Given Plaintiff's admissions that

she purchased the vehicle at issue, her identity-theft-related arguments are not

well-taken.

### C.  PLAINTIFF'S ARGUMENTS CONCERNING SIGNATURES

Plaintiff states that she did not consent to the use of electronic signatures

when she purchased the vehicle.  She also alleges that the signatures on some of the

documents appear to be cut and pasted.  In addition, she claims, "No signed AAA

arbitration agreement has been produced," Pl.'s Resp. [47] at 3, and "E-SIGN Act

authentication requirements were not met," Pl.'s Mot. [11] at 2.[8]

As previously explained, Defendants claim Plaintiff signed two contracts that

contain arbitration clauses—a Purchase Agreement and a RISC.  The Purchase

Agreement has physical, handwritten signatures, and the RISC has electronic

signatures.  The Purchase Agreement contains the following agreement to arbitrate:

> Except for action by Champion or its assignees to retake the vehicle if I
> default on my payments, any dispute pertaining to the vehicle or this
> agreement (including related documents such as finance, insurance,
> and/or service agreements) shall be resolved by arbitration
> administered by the American Arbitration Association ("AAA") under
> its rules. . . . This agreement to arbitrate will survive this agreement
> and the duration of any vehicle financing.  It applies to all covered
> disputes, regardless of how long those disputes occur after this
> agreement or my ownership of the vehicle ceases.

---

[8] The E-Sign Act provides that a contract relating to any transaction in or affecting
interstate or foreign commerce "may not be denied legal effect, validity, or
enforceability solely because an electronic signature or electronic record was used in
its formation."  15 U.S.C. § 7001(a)(1).

Purchase Agreement [10-1] at 12–13.

While Plaintiff claims that her signature was cut and pasted on some of the

other documents signed when she purchased the vehicle, she has not challenged the

handwritten signature that appears on the Purchase Agreement.[9]  As a result, the

Purchase Agreement contains a valid arbitration agreement.

Out of an abundance of caution, the Court will address Plaintiff's argument

disputing the validity of the electronic signature in the RISC, which also contains

an arbitration clause.  The following statements appear at the bottom of the first

page of the RISC:

> **Agreement to Arbitrate:** By signing below, you agree that, pursuant
> to the Arbitration Provision on page 4 of this contract, you or we may
> elect to resolve any dispute by neutral, binding arbitration and not by
> a court action.  See the Arbitration Provision for additional information
> concerning the agreement to arbitrate.

RISC [10-1] at 1.  The electronic signatures of Plaintiff and her co-signor appear

directly below these statements regarding arbitration.  The arbitration provision

that appears on page 4 of the RISC provides:

> Any claim or dispute, whether in contract, tort, statute or otherwise
> (including the interpretation and scope of this Arbitration Provision,
> and the arbitrability of the claim or dispute), between you and us or
> our employees, agents, successors or assigns, which arises out of or
> relates to your credit application, purchase or condition of this
> vehicle, this contract or any resulting transaction or relationship
> (including any such relationship with third parties who do not sign

---

[9] Plaintiff attaches an incomplete copy of the Purchase Agreement as an exhibit to
one of her motions in an effort to show that it was unsigned.  She further claims,
without explanation, that it contains conflicting terms.  A complete copy of the
Purchase Agreement, including signatures, has been filed by GM Financial along
with an affidavit.  *See* Aff. [10-1].

> this contract) shall, at your or our election, be resolved by neutral,
> binding arbitration and not by a court action . . . . You may choose
> the American Arbitration Association (www.adr.org) or any other
> organization to conduct the arbitration subject to our approval . . . .
> Any arbitration under this Arbitration Provision shall be governed
> by the Federal Arbitration Act (9 U.S.C. § 1 et seq.) and not by any
> state law concerning arbitration . . . .

*Id.* at 4. The RISC also contains a clause entitled "Electronic Contracting and

Signature Acknowledgment," which states in part:

> You agree that (i) this contract is an electronic contract executed by
> you using your electronic signature, (ii) your electronic signature
> signifies your intent to enter into this contract and that this contract
> be legally valid and enforceable in accordance with its terms to the
> same extent as if you had executed this contract using your written
> signature . . . .

 *Id.*

"Ordinarily one of the acts forming part of the execution of a written contract

is the signing of it for the object of a signature is to show mutuality of assent."

*Turney v. Marion Cnty. Bd. Of Educ.*, 481 So. 2d 770, 774 (Miss. 1985).

> However, signature is not always essential to the binding force of an
> agreement, and whether a writing constitutes a binding contract even
> though it is not signed or whether the signing of the instrument is a
> condition precedent to its becoming a binding contract usually depends
> on the intention of the parties. The object of a signature is to show
> mutuality or assent, but these facts may be shown in other ways, as,
> for example, by the acts or conduct of the parties. The question as to
> whether those who have signed are bound is generally to be
> determined by the intention and understanding of the parties at the
> time of the execution of the instrument.

*Byrd v. Simmons*, 5 So. 3d 384, 389 (Miss. 2009). Mississippi has adopted the

Uniform Electronic Transactions Act ("UETA") which provides that a "signature

may not be denied legal effect or enforceability solely because it is in electronic

form," and that a "contract may not be denied legal effect or enforceability solely because an electronic record was used in its formation." Miss. Code Ann. § 75-12-13. As a result, physical signatures are not required. *Buckhalter v. J.C. Penney Corp.*, No. 3:11-CV-752-CWR-FKB, 2012 WL 4468455, at \*2 (S.D. Miss. Sept. 25, 2012). In some of her submissions, Plaintiff mentions the E-Sign Act, which was enacted by Congress the year after the Uniform Law Commission introduced the UETA.

Once again, Plaintiff does not dispute her presence at the dealership when she purchased the vehicle. She has filed numerous affidavits, but she has not testified that she did not sign the RISC. Her arguments also fall short of making this assertion. For example, Plaintiff asserts, "Signatures on key documents appear to have been cut and pasted, indicating *possible* forgery." Pl.'s Mot. [18] at 2 (emphasis added).

To dispute formation of an arbitration agreement, Plaintiff "was required to both unequivocally deny that [she] agreed to arbitrate and produce some evidence supporting [her] position." *See Yanez v. Dish Network, L.L.C.*, 140 F.4th 626, 630 (5th Cir. 2025). Since Plaintiff has not adequately placed the authenticity of the signatures in question, it is not necessary to require arbitration-related discovery or conduct a hearing on this issue. The fact that the RISC contains electronic signatures is not, in and of itself, sufficient grounds for invalidating a contract under Mississippi law. As a result, both the Purchase Agreement and RISC contain arbitration agreements.

### D. PLAINTIFF'S ADDITIONAL ARGUMENTS

Plaintiff also argues "[r]efund checks were issued and applied after the contract was allegedly completed," "[f]raud voids the entire contract, including the arbitration clause," "[m]ultiple versions of the alleged contract exist with conflicting terms," "[e]ssential terms were altered after the alleged contract date," "[f]inancial adjustments applied without Plaintiff's knowledge or assent," "[t]he alleged agreement was reopened after November 29, 2023," and "[P]laintiff never received a complete, mutually executed contract." Pl.'s Mot. [11] at 1–2; Pl.'s Mot. [49] at 1–2. All these arguments pertain to the validity of the entire contract or a possible breach of contract. Since these arguments do not pertain to the question whether the parties entered into the arbitration agreement itself, they cannot be considered by the Court. *See Green Tree Servicing, L.L.C.*, 890 F.3d at 504 (citation modified) ("Even in cases where the alleged fraud that induced the whole contract equally induced the agreement to arbitrate which was part of that contract, the Supreme Court nonetheless requires the challenge to be directed specifically to the agreement to arbitrate as a prerequisite to judicial intervention.").

### E. WHETHER THE DEALERSHIP WAIVED ITS RIGHT TO ARBITRATION

"Waiver . . . is the intentional relinquishment or abandonment of a known right." *Morgan v. Sundance, Inc.*, 596 U.S. 411, 419 (2022). "[W]hether a party waived its right to arbitrate is necessarily fact-intensive; thus, a fact that weighs in favor of waiver in one case may not carry any weight in another." *Garcia v. Fuentes Rest. Mgmt. Servs. Inc.*, 141 F.4th 671, 677 (5th Cir. 2025). Courts must consider

the totality of the circumstances when determining whether a party waived its right

to arbitration.  *Id.*  One of the ways in which a party waives its right to arbitration

is by "substantially invok[ing] the litigative process."  *Id.* at 674.  "Answering a

complaint does not typically suggest that a party has substantially invoked the

judicial process.  After all, answers are the most basic form of responsive litigation,

with failure to answer resulting in a default judgment."  *Id.* at 679.

Plaintiff notes that the Dealership demanded a jury trial when it filed its

[5] Answer on November 13, 2025.  However, the Dealership also invoked the

Purchase Agreement's arbitration clause in its Answer.  It filed a [43] Joinder in

GM Financial's Motion to Compel Arbitration on December 2, 2025, and it filed its

own [44] Motion on December 5th.  As a result, the Dealership has not intentionally

relinquished its right to arbitration.

## III.  WHETHER THE ARBITRATION AGREEMENT CONTAINS A DELEGATION CLAUSE

At the second step, the court must decide whether the arbitration agreement

contains a delegation clause.  *Kubala*, 830 F.3d at 202.  "[A] valid delegation clause

requires the court to refer a claim to arbitration to allow the arbitrator to decide

gateway arbitrability issues."  *Id.* (citing *Rent-A-Ctr., W., Inc.*, 561 U.S. at 68–69).

These "gateway" issues include "whether the parties have agreed to arbitrate or

whether their agreement covers a particular controversy."  *Rent-A-Ctr., W., Inc.*, 561

U.S. at 69.  "An agreement to arbitrate a gateway issue is simply an additional,

antecedent agreement the party seeking arbitration asks the federal court to

enforce, and the FAA operates on this additional arbitration agreement just as it does on any other." *Id.*

A delegation clause is valid and enforceable if it "evinces an intent to have the arbitrator decide whether a given claim must be arbitrated." *Kubala*, 830 F.3d at 202. "If there is an agreement to arbitrate with a delegation clause, and absent a challenge to the delegation clause itself, we will consider that clause to be valid and compel arbitration." *Edwards*, 888 F.3d at 744. "[U]nless the party challenged the delegation provision specifically, the Court must treat it as valid and must enforce it, leaving any challenge to the validity of the Agreement as a whole [i.e, the arbitration agreement] for the arbitrator." *Id.* (citation modified). An express delegation clause is not required; "an arbitration agreement that incorporates the AAA Rules presents clear and unmistakable evidence that the parties agreed to arbitrate arbitrability." *Archer & White Sales, Inc. v. Henry Schein, Inc.*, 935 F.3d 274, 279 (5th Cir. 2019).

The RISC contains a delegation clause because it provides that "[a]ny claim or dispute, whether in contract, tort, statute or otherwise (*including the interpretation and scope of this Arbitration Provision, and the arbitrability of the claim or dispute*)" shall be resolved by arbitration. RISC [10-1] at 4 (emphasis added). Furthermore, the arbitration clause in the Purchase Agreement contains clear evidence that the parties agreed to arbitrate arbitrability because it provides disputes between the parties "shall be resolved by arbitration administered by the AAA under its rules." Purchase Agreement [10-1] at 12–13. Since both agreements

contain valid delegation clauses, the case must be submitted to arbitration for

"gateway rulings on threshold arbitrability issues." *See Kubala*, 830 F.3d at 202.  In

other words, all of Plaintiff's remaining arguments must be evaluated by an

arbitrator.

## IV.  DEFENDANTS' MOTIONS TO DISMISS

Defendants ask the Court to dismiss the case because all of Plaintiff's claims

must be resolved by arbitration.  "If all of the issues raised before the district court

are arbitrable, dismissal of the case is not inappropriate." *Fedmet Corp. v. M/V

BUYALYK*, 194 F.3d 674, 678 (5th Cir. 1999).[10]  Dismissal in this circumstance is

without prejudice.  *See id.*  As a result, Defendants' Motions to Dismiss are granted.

CONCLUSION

Since the parties entered into two contracts that contain arbitration

agreements, and the parties clearly and unequivocally agreed that the question of

arbitrability should be determined by an arbitrator, Defendants' Motions to Compel

Arbitration must be granted, and Plaintiffs' fifteen Motions challenging arbitration

must be denied.  Since Plaintiff must pursue all her claims in an arbitration

proceeding, Defendants' Motions to Dismiss are granted.

**IT IS THEREFORE ORDERED AND ADJUDGED** that Defendants' [9,

44] Motions to Compel Arbitration are **GRANTED**.  If Plaintiff wishes to pursue

---

[10] The Supreme Court has held that dismissal is not appropriate when a party has filed a motion to stay under 9 U.S.C. § 3.  *Smith v. Spizzirri*, 601 U.S. 472, 475–76 (2024).  The *Spizzirri* decision does not apply when, as here, no party has sought a stay.  *See Wallrich v. Samsung Elecs. Am., Inc.*, 106 F.4th 609, 617 (7th Cir. 2024).

-18-

her claims, she must file them in an arbitration proceeding.

**IT IS FURTHER ORDERED AND ADJUDGED** that Plaintiff's [11, 13, 15, 16, 17, 18, 19, 24, 25, 33, 34, 36, 40, 41, 49] Motions are **DENIED**.

**IT IS FURTHER ORDERED AND ADJUDGED** that Defendants' Motions to Dismiss are **GRANTED**.  This lawsuit is hereby **DISMISSED WITHOUT PREJUDICE**.

**SO ORDERED AND ADJUDGED** this the 30th day of December, 2025.

s/ *Louis Guirola, Jr.*

LOUIS GUIROLA, JR.
UNITED STATES DISTRICT JUDGE